# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN)<br><br>ECF Case |
|---|---|
| This document relates to:<br>*Gaston, et al. v. The Islamic Republic of Iran* | 1:18-cv-12337 (GBD)(SN)<br><br>ECF Case |

## *GASTON* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENT AGAINST THE ISLAMIC REPUBLIC OF IRAN AS TO LIABILITY AND DAMAGES

# TABLE OF CONTENTS

**Contents**

I.   **INTRODUCTION** ..................................................................................................... 1

II.  **FACTUAL BACKGROUND** ................................................................................... 2

   A.   United States' Recognition of Iran as a State Sponsor of Terrorism ................................. 3

   B.   Iran's Training and Support of al Qaeda Operatives .......................................................... 4

   C.   Iran's Support for the September 11, 2001 Attacks ............................................................ 5

III. **JURISDICTIONAL BASIS FOR RELIEF UNDER THE FSIA** ................................. 7

   A.   This Court Has Subject Matter Jurisdiction over the Iran Defendants Pursuant to the FSIA .......... 7

   B.   This Court's Prior Holding that It Has Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1605A is Controlling .......... 9

   C.   This Court has Personal Jurisdiction Over Iran ................................................................. 10

IV.  **STANDARDS FOR FSIA DEFAULT JUDGMENTS AND 1605A LIABILITY** ................. 12

   A.   Legal Standard for FSIA Default Judgment ...................................................................... 12

   B.   This Court can Take Judicial Notice of Previously-Rendered Conclusions of Facts and Law That Establish Iran's Liability for the September 11th Attacks .......... 14

   C.   Plaintiffs State a Cause of Action Under the Terrorism Exception of the FSIA ............... 16

   D.   Plaintiff's Injuries Were Caused by Acts of Extrajudicial Killings and Iran's Provision of Material Support and Resources to al Qaeda .......... 16

      1.   Causation ................................................................................................................. 18

V.   **EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA FOR THE SEPTEMBER 11, 2001 ATTACKS** .......... 19

   A.   Iran's Material Support of Al Qaeda Caused the September 11, 2001 Attacks ............... 19

VI.  **JUDGMENT AS TO DAMAGES** ......................................................................... 20

   A.   Pain and Suffering Damages ............................................................................................. 21

   B.   Punitive Damages ............................................................................................................. 23

   C.   Prejudgment Interest ......................................................................................................... 23

VII. **CONCLUSION** ..................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011) .................. 23

*Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) .................................. 18

*Booth v. Fletcher,* 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ............................................... 14

*Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010) 16

*Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) ................................. 13

*Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012) ...................... 12,14

*Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) .................................... 14

*Federal Insurance Co. v. Kingdom of Saudi Arabia*, 741 F.3d 353, 358 (2d Cir. 2013) ...................... 9

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) ................................... 18

*Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008) ................................... 17

*Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) .................................. 13

*Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003) ...................................... 12

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ................................... 13

*Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) .................................. 15

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262 (D.D.C. 2001) ............................................................................................. 13

*Leibovitch v. Syrian Arab Republic*, No. 08 C 01939, 2014 U.S. Dist. LEXIS 82487 (N.D. Ill. Mar. 31, 2014) ................................................................................................ 15

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) .............................. 14

*Opati v. Republic of Sudan*, 60 F Supp. 3d 68, 73 (D.D.C. 2014) ...................................... 14

*Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 136 (D.D.C. 2011) .................................. 10,16

*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) ................................. 14

*Reed v. Islamic Republic of Iran*, No. 03-2657 (RMU), 2012 U.S. Dist. LEXIS 24866, at *7 (D.D.C. Feb. 28, 2012) ........................................................................................... 12

*Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008) ............................ 13

*Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va. 2007) ................................ 18

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991) ................................... 10,12

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) ..................... 12

*Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011) ............................... 13

*United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ....................................... 9

*Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007) ............................ 13,14

*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002) ........................... 13

## Statutes

28 U.S.C. § 1605A(a)(1) .............................................................................. *7,8,16,20*

18 U.S.C. § 2339A(b)(1) ............................................................................. *17,18*

28 U.S.C. § 1605A .................................................................................. *passim*

28 U.S.C. § 1605(a)(5) .............................................................................. *8,9*

ii

28 U.S.C. § 1605A(c)(4)............................................................................................20,23

28 U.S.C. § 1608(a)..........................................................................................................11

28 U.S.C. § 1330...........................................................................................................7,9

28 U.S.C. § 1608(c)(1)......................................................................................................12

28 U.S.C. § 1608(e)..................................................................................................12,13,15

Plaintiffs, Mark Bernheimer, David Blacksberg, Carlos Fraga, Christopher Kelly, Marianne Kelly, Basilio Stewart, James Toledo, Thomas Vairo, Joseph Viscuso, and Tracy Young by and through undersigned counsel, respectfully submit this memorandum of law in support of Plaintiffs' motion for entry of judgment by default against Defendant, The Islamic Republic of Iran ("Iran").

## I.    INTRODUCTION

This action arises out of the events of September 11, 2001, during which members of the al Qaeda terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States ("the September 11th attacks"). Plaintiffs (collectively "*Gaston* Plaintiffs") filed lawsuits against Iran and are comprised of personal representatives and eligible immediate family members of individuals killed in the September 11th Attacks as well as injured plaintiffs themselves. *See* Complaint, *Gaston, et al v. Islamic Republic of Iran*, Case No. 18-cv-12337 (S.D.N.Y 2018), ECF No. 1. The defendants have never appeared in the case or filed an answer to the complaint after being properly served according to United States law. A default judgment ruling is appropriate.

Plaintiffs brought claims against Iran based on its decade long direct sponsorship of al Qaeda leading up to the September 11 terrorist attacks, which included support that directly assisted and enabled al Qaeda to carry out the September 11th attacks. Throughout the time that Iran sponsored al Qaeda, it knew and intended that al Qaeda would use this support to carry out terrorist attacks against the United States and its allies, a goal al Qaeda announced publicly on numerous occasions prior to September 11, 2001.

Mark Bernheimer, David Blacksberg, Carlos Fraga, Christopher Kelly, Marianne Kelly, Basilio Stewart, James Toledo, Thomas Vairo, Joseph Viscuso, and Tracy Young are United

1

States nationals who sustained personal injuries resulting from the attacks on September 11, 2001 and its immediate aftermath.  This Court already has entered judgment against Iran for identical claims, in multiple related matters consolidated before this Court in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, based on a full evidentiary record and hearing pursuant to the FSIA. The extension of those rulings to this case is both appropriate and consistent with the specific objectives that prompted the Judicial Panel for Multidistrict Litigation to centralize each of those proceedings before this Court.

## II.    FACTUAL BACKGROUND

Plaintiffs seek entry of default judgment against Iran based on Iran's provision of material support to al Qaeda and direct support for, and sponsorship of, the September 11th attacks. Iran provided material support and resources to al Qaeda and bin Laden both directly and through Iran's surrogate, Hezbollah. The support provided by Iran was a direct and proximate cause of the September 11th attacks. Without Iran's active support, al Qaeda could never have carried out those attacks.

The government of Iran has a long history of providing material support and resources to terrorist organizations targeting the United States and its citizens, including al Qaeda. In 2011, this Court entered Findings of Fact and Conclusions of Law in the *Havlish* case, part of the *In re Terrorist Attacks on September 11*, 2001 MDL, specifically outlining Iran's longstanding role in the development of the al Qaeda network, and direct support for the September 11th attacks themselves.  This Court's findings of fact in the *Havlish* proceeding are supported by an array of government reports, including the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"). The 9/11 Commission concluded that Iran forged a cooperation agreement with al Qaeda in the early 1990's, pursuant to which Iran

provided a range of training and assistance to al Qaeda for nearly a decade leading up to the September 11th attacks; and that Iran facilitated the travel of senior al Qaeda figures and several of the future 9/11 hijackers into Afghanistan, thereby directly assisting al Qaeda in the planning and execution of the September 11th attacks. *See* 9/11 Final Report at pp. 60-61, 240-241.

The 9/11 Commission's findings were further corroborated by affidavits of terrorism experts Dietrich L. Snell, Dr. Daniel L. Byman, Janice L. Kephart, Dr. Patrick Clawson, Claire M. Lopez, Dr. Bruce D. Tefft, Dr. Ronen Bergman, and Kenneth Timmerman, submitted in the *Havlish* default proceedings. Based on the overwhelming evidence, this Court recognized Iran's critical role in enabling and facilitating al Qaeda's terrorist activities, concluding that "there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven." *See* Havlish Findings, Ex. A at p. 35 ¶ 213 (citing Ex. 5, Snell Aff. ¶ 23). "Iran's facilitation of the hijackers' terrorist travel operation constituted material support – indeed direct support – for al Qaeda 9/11 attacks," Havlish Findings, Ex. A at p. 39 ¶ 234 (citing Ex.4, Kephart Aff. ¶ 66), and that evidence of record "leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s." Havlish Findings, Ex. A at p. 41 ¶ 247 (citing Ex. 6, Lopez- Tefft Aff. ¶ 352).

### A. United States' Recognition of Iran as a State Sponsor of Terrorism

The United States Government has recognized and condemned Iran's support of terrorist attacks for over 30 years. Since January 19, 1984, Iran has been designated by the United States Secretary of State as a State Sponsor of Terrorism on the basis that it "repeatedly provided support for acts of international terrorism." On March 16, 1995, in response to Iranian support of international terrorism, President Clinton issued Executive Order 12957, which prohibited

United States involvement with petroleum development in Iran. On May 6, 1995, President

Clinton strengthened these sanctions by signing Executive Order 12959, pursuant to the

International Emergency Economic Powers Act. President Clinton imposed additional

restrictions on Iran pursuant to Executive Order 13059 on August 19, 1997. This Order reflected

the Executive Branch's intent to prohibit virtually all trade and investment activities with Iran by

United States persons.

### B. Iran's Training and Support of al Qaeda Operatives

This Court's prior findings of fact affirm that Iran "has engaged in, and supported,

terrorism as an instrument of foreign policy, virtually from the inception of its existence after the

Iranian Revolution in 1979." Ex. A at p. 6 ¶ 1. Beginning in the mid-to-late 1980s, Iran began

formulating contingency plans for anti-United States terrorist operations. *Id*. at p. 15 ¶ 70. As this

Court has previously found:

> In the early 1990s, casting aside the historic bitterness between the Sunni and
> Shi'a sects of Islam, Sudanese religious-political leader Hassan al Turabi and
> Iran's political leadership and intelligence agencies established close ties,
> including paramilitary and intelligence connections, beginning a united Sunni-
> Shiite front against the United States and the West. . . .

> While Osama bin Laden and al Qaeda were headquartered in Sudan in the early
> 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for
> combined Sunni and Shi'a opposition to the United States and the West, an effort
> that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri,
> leaders of al Qaeda, and by the leadership of Iran. . . .

Havlish Findings, Ex. A at p. 16 ¶¶ 72-73.    In 1993, bin Laden and Ayman al Zawahiri met in

Sudan to develop an "alliance of joint cooperation and support on terrorism" with Iran's master

terrorist, Imad Mughniyah, and Iranian officials. Havlish Findings, Ex. A. at pp. 16-17, ¶¶ 79-80.

The 1993 meeting in Khartoum led to an ongoing series of communications, training

arrangements, and operations among Iran, Hezbollah and al Qaeda. Osama bin Laden sent more

terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hezbollah training camps operated by Mughniyah and the IRGC (defendant, Islamic Revolutionary Guard Corps) in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence and security.

*Id*. at p. 17 ¶ 83. The al Qaeda-Iran-Hezbollah terrorist training continued throughout the 1990s. "At all times, Iran's Supreme Leader (Ayatollah Ali Hoseini Khamenei) was fully aware that Hezbollah was training such foreign terrorists." *Id*. at p. 18 ¶ 88.

### C.  Iran's Support for the September 11, 2001 Attacks

In *Havlish*, this Court held that "Iran furnished material and direct support for the 9/11 terrorists' specific terrorist travel operation" and the facilitation of al Qaeda's operatives' travel to training camps in Afghanistan was "essential for the success of the 9/11 operation." Havlish Findings, Ex. A at p. 22 ¶¶ 116, 118-119. This finding is consistent with the 9/11 Report which concluded "[f]or terrorists, success is often dependent on travel . . . For terrorists, travel documents are as important as weapons." *Id*. at ¶ 117 (citing 9/11 Report, p. 384).

This Court's previous findings of fact confirm the ways in which Iran directly facilitated and supported al Qaeda relative to the September 11, 2001 attacks:

> The first way in which the Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Several of the 9/11 hijackers transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. Thus, Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11. Some of these were future 9/11 hijackers.
>
> * * *

> Iran's willingness to permit the undocumented admission and passage of al Qaeda operatives and 9/11 hijackers provided key material support to al Qaeda. By not stamping the hijackers' passports, by providing safe passage through Iran and into Afghanistan, and by permitting Hezbollah to receive the traveling group . . . Iran, in essence, acted as a state sponsor of terrorist travel.

*Id*. at pp. 22, 24, ¶¶ 122, 132. This Court's findings on this point are corroborated by National Security Administration intercepts made available to the 9/11 Commission shortly before the publication of the 9/11 Report. *See Id*. at p. 123. Moreover, "[n]umerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay confirm the existence of the clandestine Iran-Afghanistan passageway." *Id*. at p. 23 ¶ 128 (citing Ex. 2, Timmerman 2nd Aff. ¶¶ 115-19).

> The second way in which Iran furnished material and direct support for the 9/11 attacks was that a terrorist agent of Iran and Hezbollah helped coordinate travel by future Saudi hijackers. As found by the 9/11 Commission, "[i]n October 2000, a senior operative of Hezbollah [Imad Mughniyah] visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November "
>
> * * *
>
> The "activities" that Mughniyah went to Saudi Arabia to "coordinate" revolved around the hijackers' travel, their obtaining new Saudi passports, and/or U.S. visas for the 9/11 operation, the hijackers' security, and the operation's security.

Havlish Findings, Ex. A at pp. 24-25, ¶¶ 134, 140. This Court found that those activities also "constituted direct and material support for the 9/11 conspiracy." *Id*. at p. 25 ¶ 144.

Additionally, Iran's provision of material support to al Qaeda continued after the September 11, 2001 attacks, "most significantly by providing safe haven to al Qaeda leaders and operatives, keeping them safe from retaliation from U.S. forces, which invaded Afghanistan." *Id*. at p. 33 ¶ 198. Indeed, the Department of State's Patterns of Global Terrorism report for calendar year 2002, released in April 2003 by the Secretary of State and Coordinator for

Counterterrorism, recognized that "al-Qaeda members have found virtual safe haven there (in Iran) and may even be receiving protection from elements of the Iranian Government." It is now well established that Iran provided al Qaeda with critical training and support, from the earliest stages of al Qaeda's formation through September 11, 2001, and even thereafter. Iran's assistance provided al Qaeda with the expertise and resources necessary to carry out large scale international terrorist attacks, and directly enabled al Qaeda to plan and carry out the September 11th attacks. As this Court already has held, Iran's provision of material support and resources was instrumental in ultimately causing the deaths and injuries of the thousands who suffered from the September 11th attacks, and subjects these defendants to liability for those injuries.

## III.    JURISDICTIONAL BASIS FOR RELIEF UNDER THE FSIA

### A.  This Court Has Subject Matter Jurisdiction over the Iran Defendants Pursuant to the FSIA

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over civil actions against foreign state defendants. 28 U.S.C. §§ 1330, 1602-1611. A federal district court may obtain jurisdiction over a foreign sovereign where one of the FSIA's enumerated exceptions applies.

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7). Significantly, 1605A created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for acts committed by the State and its agents. Despite the significant changes in the law, however, the requirements for the Court to assert its subject matter

jurisdiction over this case have not changed. *See* 28 U.S.C § 1605A(a)(1), (a)(2).

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow

Plaintiffs to seek money damages for personal injury or death if the damages were caused

by:

1. the providing of "material support or resources"[1] for an act of hostage taking, torture, or an extrajudicial killing;

2. engaged in by an official while acting within the scope of his office;

3. the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

4. the claimant or the victim was a "national of the United States."

28 U.S.C. § 1605A(a)(1), (a)(2).

This Court already has held that subject matter jurisdiction exists for claims against the

Iran Defendants for injuries resulting from the September 11th attacks under two separate,

independent provisions of the FSIA: the State Sponsor of Terrorism exception (28 U.S.C. §

1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)). Havlish Findings, Ex. A

at p. 46 ¶ 4. Those rulings control in relation to the present application in this case, although this

motion focuses solely on the jurisdictional grant and substantive remedies provided under §

1605A.

---

[1] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

**B. This Court's Prior Holding that It Has Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1605A is Controlling**

In its findings of fact and conclusions of law issued in the *Havlish* case, this Court held that it had subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th attacks pursuant to both §§ 1605A and 1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. § § 1330(a) and 1604. *Owens v. Republic of Sudan*, 2011 WL 5966900 (D.D.C. Nov. 28, 2011). Here, this Court has jurisdiction because service was proper and defendants' conduct falls within both the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and the "noncommercial tort" exception of § 1605(a)(5).

*See* Havlish Findings, Ex. A at p. 46 ¶ 4.

Through the present motion, the *Gaston* Plaintiffs seek entry of default judgments as to liability solely in relation to their substantive causes of action arising under § 1605A, and thus only the exception to immunity provided under that section is implicated by the instant proceedings. With respect to that issue, this Court's prior holding that § 1605A provides a proper basis for subject matter jurisdiction for claims against the Iran Defendants for injuries resulting from the September 11th attacks is controlling, and the issue need not, and indeed should not, be re-litigated in the context of the present default judgment proceedings. *Federal Insurance Co. v. Kingdom of Saudi Arabia*, 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the "September 11 cases were centralized in part to 'prevent inconsistent pretrial rulings'"); *See also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotations omitted) ("when a court has ruled on an issue that decision should generally be adhered to by that court in subsequent stages in the same case.").

This Court has also previously extended the ruling in *Havlish* to apply to other related actions against the Iran Defendants in other actions pending in the *In re Terrorist Attacks on September 11*, 2001 multidistrict litigation, in the *Hoglan*, *Federal Insurance*, *Ashton*, and *O'Neill* cases. *See*, e.g., *Hoglan v. Islamic Rep. of Iran*, 1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015); *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, ECF Nos. 3014 (Ashton), 3016 (O'Neill), 3020 (Federal Ins.) (Aug. 31, 2015).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605A to claims against the Iran Defendants for injuries resulting from the September 11th attacks applies with full force to the claims asserted against Iran by the *Gaston* Plaintiffs.

### C. This Court has Personal Jurisdiction Over Iran

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148 (D.D.C. 2011). The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision. Fed. R. Civ. P. 4(j)(1). The FSIA prescribes four methods of service:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The first two methods of service were not possible in this case as plaintiffs have no "special arrangement" for service with Iran and Iran is not a party to an "international convention on service of judicial documents."

Plaintiffs' attempt to serve the Iranian Defendants through 28 U.S.C. § 1608(a)(3) was unsuccessful. *Gaston, et al. v. Islamic Republic of Iran*, 18-cv-12337 (S.D.N.Y. 2018) ECF No. 12. Accordingly, on September 24, 2019**,** after 30 days elapsed from attempted 1608(a)(3) service, Plaintiffs mailed two copies of the summons, complaint, and notice of suit along with translations of each to the United States Department of State (to the attention of the Director of Special Consular Services) for service through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4). *Gaston, et al. v. Islamic Republic of Iran,* 18-cv-12337 (S.D.N.Y. 2018) ECF No. 13.

A consular officer from Bern Switzerland confirmed with our office that service was effectuated under § 1608(a)(4) on December 18, 2019, when the United States Department of State delivered the Service Documents to Iran under diplomatic note. That diplomatic note was then filed with the Court. *Gaston, et al. v. Islamic Republic of Iran,* 18-cv-12337 (S.D.N.Y. 2018) ECF No. 51. Additionally, the Iranian Defendants were served with a diplomatic note of transmittal that specifically stated:

[U]nder U.S. law any jurisdictional or other defense including claims of sovereign immunity must be addressed to the court before which the matter is pending, for which reason it is advisable to consult an attorney in the United States. Otherwise proceedings will continue without an opportunity to present arguments or evidence.

22 F.R. 93.1(d). In the case of service under 1608(a)(4) "service shall be deemed to have been made…as of the date of *transmittal* indicated in the certified copy of the diplomatic note." 28 U.S.C. 1608(c)(1)(emphasis added).

Because service upon Iran was proper, and § 1605A provides subject matter jurisdiction for Plaintiff's claims against Iran, this Court may exercise personal jurisdiction over Iran. *Shapiro*, 930 F.2d at 1020; *See* also *Reed v. Islamic Republic of Iran*, No. 03-2657 (RMU), 2012 U.S. Dist. LEXIS 24866, at *7 (D.D.C. Feb. 28, 2012).

## IV.    STANDARDS FOR FSIA DEFAULT JUDGMENTS AND 1605A LIABILITY

### A.  Legal Standard for FSIA Default Judgment

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. 1608(e). This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003). *See*, e.g., *Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (adopting standard used in Ungar and finding Iraq liable for September 11, 2001 terrorist acts).

Courts within the Second Circuit have noted that the proper standard for establishing liability under the FSIA should be "less than normally required," *Id*. at 223, and that a plaintiff need merely demonstrate a prima facie case to obtain a judgment of liability in a FSIA case. *See Ungar*, 211 F. Supp. 2d at 98. A plaintiff meets its burden of proof by affidavit or similar evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

Section 1608(e) does not require a new evidentiary hearing to establish liability when a foreign sovereign is in default. *See Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy § 1608(e)); *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262 (D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by documentary and affidavit evidence without evidentiary hearing). Instead, a plaintiff seeking a default judgment under the FSIA may meet its burden by entering into evidence certified transcripts of relevant testimony presented in a previous proceeding. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on affidavit testimony and certified transcript from another proceeding are sufficient to establish Iran's provision of material support and resources to al Qaeda). In lieu of filing affidavits from witnesses that testified in a previous case, plaintiffs may submit certified copies of the witnesses' transcript from the previous case to establish particular facts. *See Weinstein*, 175 F. Supp. 2d at 22; *See* also *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court has found facts relevant to a FSIA case involving material support to

terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in

earlier litigation . . . without necessitating the formality of having that evidence reproduced.'"

(citing *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011)); *See also Haim

v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn

testimony and documentary evidence presented in prior proceedings which arose out of 1995

Gaza strip bombing at issue in Haim litigation).

### B.  This Court can Take Judicial Notice of Previously-Rendered Conclusions of Facts and Laws That Establish Iran's Liability for the September 11th Attacks

"Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts 'not subject

to reasonable dispute' that are 'capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned.'" *Opati v. Republic of Sudan*, 60 F Supp. 3d

68, 73 (D.D.C. 2014) (noting that "Courts in this district have done so frequently in the FSIA

context") (citing *Booth v. Fletcher,* 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); 29 Am. Jur. 2d

Evidence § 151 (2010)). It is well established that courts may reach their own independent

findings of fact based on judicial notice of evidence presented in earlier related proceedings. *Id.*

(granting a motion for a default judgment where plaintiffs "rely solely" on "judicial notice of

related proceedings and records in cases before the same court.") (quoting *Valore v. Islamic

Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010)); *see also Estate of Botvin v. Islamic

Republic of Iran*, 873 F. Supp. 2d at 237 ("the proper approach is one 'that permits courts in

subsequent related cases to rely upon the evidence presented in earlier litigation . . . without

necessitating the formality of having that evidence reproduced.'").

The "FSIA does not require this Court to re-litigate issues that have already been settled

in previous decisions. Instead, the Court may review evidence considered in an opinion that is

judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (taking judicial notice of findings of fact and conclusions of law made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), which also arose out of 1983 Beirut bombing); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) (same); *Heiser*, 466 F. Supp. 2d at 229, 263 (D.D.C. 2006) (taking judicial notice of facts findings made in case brought against same defendants for damages arising from same 1996 attack on Khobar Towers); *See* also *Leibovitch v. Syrian Arab Republic*, No. 08 C 01939, 2014 U.S. Dist. LEXIS 82487 (N.D. Ill. Mar. 31, 2014) (taking judicial notice of findings of fact in related proceedings arising out of terrorist attack where defendants failed to appear or otherwise plead).

> [T]he statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack. Rather, the requirement was intended to ensure that the courts give proper deference to the political branches' predominant role in foreign affairs by pausing to ensure the validity of their actions before undertaking the substantial step of piercing sovereign immunity and entering judgment against a foreign state. Mindful of these interests, courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010).

As set forth, this Court's prior findings of fact, and the affidavits and documentary evidence already of record, provide a detailed record of Iran's involvement with and sponsorship of al Qaeda and the September 11, 2001 attacks, and are more than sufficient to support entry of default judgment against Iran as to liability in this action, pursuant to the substantial liability standards governing their § 1605A(c) claims.

### C.  Plaintiffs State a Cause of Action under the Terrorism Exception of the FSIA

In addition to establishing a basis for subject matter jurisdiction for Plaintiffs' claims against the Iran Defendants, §1605A also provides a substantive cause of action imposing liability against the Iran Defendants for Plaintiffs' injuries. Pursuant to § 1605A(c), a country designated as a State Sponsor of Terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources. *See* § 1605A(a)(1); (c). As the District Court for the District of Columbia explained in 2011:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintained jurisdiction under this section for money damages."

*See Owens*, 826 F. Supp. 2d at 153 ("liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010)).  Section 1605A(c) authorizes the recovery of economic damages, solatium, pain and suffering and punitive damages.

### D.  Plaintiffs' Injuries Were Caused by Acts of Extrajudicial Killings and Iran's Provision of Material Support and Resources to al Qaeda.

The basis of Iran's liability is its provision of material support and resources to al Qaeda which caused the September 11, 2001 attacks and resulted in the death and injuries of thousands of United States citizens. *See*, e.g., *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 59 (explaining Iran's material support to HAMAS in the form of funding, safehaven, training and weapons was responsible for suicide attacks). In order to demonstrate that Plaintiffs

have a cause of action under §1605A, Plaintiffs must satisfy the elements of § 1605A(a)(1). *See Owens*, 826 F. Supp. 2d at 153.

In FSIA cases involving terrorist attacks caused by a foreign state's provision of material support or resources, a court must "determine whether a defendant country has provided material support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Section 1605A(h) adopts the definition of "material support or resources" set forth in 18 U.S.C. § 2339A:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

The record evidence concerning Iran's support of al Qaeda easily satisfies this definition of "material support." Indeed, this Court already has entered a conclusion of law recognizing that Iran "provided material support and resources to al Qaeda for acts of terrorism" including the September 11, 2001 attacks. Havlish Findings of Fact, Exh. A at p. 50 ¶ 17; *See also Id*, at p. 47 ¶ 7 ("plaintiffs have established that their injuries were caused by defendants'' acts of 'extrajudicial killing' and/or the provision of 'material support for such acts.'"). This conclusion clearly is correct, as the definition of material support prohibits the provision of any form of property or service to a terrorist organization, making specific reference to "expert advice or

assistance" and "transportation" and "financial" services, all of which are forms of support Iran provided to al Qaeda. And, the definition plainly recognizes the critical benefits terrorists obtain through any support that assists them in traveling, by expressly including "safe haven," "lodging," "false documentation or identification" and "transportation" as forms of prohibited support. 18 U.S.C. § 2339A(b)(1); *See also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) (recognizing provision of training and travel documents to facilitate acts constitutes material support); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va. 2007) (safe haven); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) (superseded by enactment of §1605A) ("routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support or resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]").

### 1. Causation

The applicable standard of causation is liberally construed in § 1605A material-support cases— namely, in such cases, Plaintiffs do not need to demonstrate any direct nexus between the material support and the eventual terrorist act.  It has been established that a "plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act for which his claim arises in order to satisfy [the terrorism exception of the FSIA]." *Flatow*, 999 F. Supp. at 18; *See* also, e.g., *In re Islamic Republic of Iran Terrorism Litig*., 659 F. Supp. 2d at 44 (holding that there is no but-for causation requirement).

Once again, this Court already has determined that the record evidence concerning the material support Iran provided to al Qaeda is more than efficient to satisfy the modest causation requirement of 1605A(c). Indeed, this Court concluded that Iran's assistance "constituted direct support and material support for al Qaeda's 9/11 attacks. Exh. "A" at p. 24 ¶ 133 (citing 9/11

Final Report); *See* also *Id*, at p. 47 ¶ 7 ("plaintiffs have established that their injuries were caused by defendants'' acts of 'extrajudicial killing' and/or the provision of 'material support for such acts.'").

## V.    EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA FOR THE SEPTEMBER 11, 2001 ATTACKS

### A.  Iran's Material Support of Al Qaeda Caused the September 11, 2001 Attacks and caused the Plaintiffs mass suffering

This Court already has analyzed the evidentiary record submitted in the *Havlish* proceeding, and issued findings of fact and law on the basis of that evidence. Although additional materials could be offered to augment that record, the Court's holdings in *Havlish* render any such supplementation unnecessary. Under the circumstances, the submission of additional or repetitive evidence would merely impose an unnecessary burden on the resources of the Court.

Plaintiffs respectfully request that the Court enter default judgment against Iran as to liability on the basis of the evidence the Court previously received and analyzed, and which already forms part of the record in the related multidistrict litigation proceeding for the September 11, 2001 terrorist attacks. As to the content and import of that evidence, Plaintiffs respectfully refer the Court to its own findings of fact and law, which comprehensively review the Court's findings upon review of that evidence. It is uncontroverted that as result of Defendants material support for the 9/11 attacks, the Plaintiffs have gravely suffered.

VI.     JUDGMENT AS TO DAMAGES

For the reasons set forth below and in the Attorney Declaration of Robert Keith Morgan,

*Gaston* Plaintiffs in Exhibit A  respectfully move this Court for an Order awarding: (1) pain and

suffering damages consistent with amounts previously awarded by this Court to various similarly

situated plaintiffs; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded

annually for the period from September 11, 2001 until the date of the judgment; and (3)

permission to seek punitive damages, economic damages, or other damages at a later date.[2]

Section 1605A of the Foreign Sovereign Immunities Act ("FSIA") creates an exception

to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the

provision of material support or resources for acts of terrorism where the acts or provision of

support or resources were engaged in by an official, employee, or agent of the foreign state while

acting within the scope of his or her office, employment, or agency. 28 U.S.C. § 1605A(a)(1).

The statute specifies that damages are available "for personal injury or death," 28 U.S.C. §

1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and

punitive damages." 28 U.S.C. § 1605A(c)(4), which is directly applicable to *Gaston* Plaintiffs.

*Gaston* Plaintiffs, Mark Bernheimer, David Blacksberg, Carlos Fraga, Christopher Kelly,

Marianne Kelly, Basilio Stewart, James Toledo, Thomas Vairo, Joseph Viscuso, and Tracy

Young, are United States nationals who sustained personal injuries resulting from the attacks on

September 11, 2001 and its immediate aftermath and are entitled to pain and suffering damages

based on this Court's previous determinations in the amounts previously established and applied

by this Court in this and other related cases arising from the 9/11 attacks. In accordance with the

---

[2] The other *Gaston* plaintiffs will move this Court for entry of default judgment at a later date.

terms of the FSIA, Plaintiffs are entitled to compensation under Section 1605A for their pain and suffering and prejudgment interest.

### A. Pain and Suffering Damages

This Court has previously examined personal injury damages in the context of the terrorist attacks on September 11, 2001. In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal injury damages (affirmed by Judge Daniels without objection) the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." *See* EFC No. 5879 at 5. This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." Havlish v. bin Laden, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (*adopted by* Judge Daniels at Havlish v. bin Laden, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).

The Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however reserves its discretion to award further upward departures in exceptional cases." *Id*. at 6. The court divided the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in

dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot, and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery.  This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id*. at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or lasting cognitive impairment; and severe pulmonary or neurological traumas. *Id*. at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering); "loss of limbs or multiple digits; severe pulmonary traumas, strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute trauma.  Injuries causing lasting physical effects severely limiting mobility and activity will generally qualify for this category." *Id*. at 8.

Consistent with these classifications and the prior decisions of the Court, the *Gaston* Plaintiffs seek damages for pain and suffering endured by each plaintiff identified on Exhibit B to the Proposed Default Judgment filed in connection with the motion this memorandum supports.  Attached to the attorney declaration of Robert Keith Morgan as Exhibits B through K are the declarations and Victim Compensation Fund (VCF) eligibility determination letters for

each of the Plaintiffs which describe the injuries and suffering endured by the plaintiffs as a direct result of the terrorist attacks.  This Court has accepted "VCF eligibility determination letters as evidence establishing 9/11 was a substantial factor leading to the [plaintiffs'] medical conditions." (*See* March 3, 2023 R. & R. ECF No. 8901 at 11, *adopted by* Aug. 9, 2023 Mem. Decision and Order, ECF No. 9274).

The plaintiffs lived or worked near Ground Zero; witnessed the immediate horror of the attack; felt the dust and debris falling around them; witnessed the horror of people jumping to their deaths; witnessed the collapse of the buildings; witnessed the aftermath in the days following the attack; and/or were involved in the rescue and recovery operations, searching the rubble for survivors and later to recover human remains.  The declarations show that each plaintiff suffered emotional injuries and debilitating physical injuries from their experience on 9/11 which continue to adversely impact their lives.  The evidence presented through the Plaintiffs declarations demonstrates why it is appropriate to award each of the *Gaston* Plaintiffs pain and suffering damages for personal injuries received as a proximate result of the attacks on 9/11.

### B.  Punitive Damages

Under the FSIA, Plaintiffs are entitled to punitive damages. *See* 28 U.S.C. § 1605A(c)(4). Previously, in connection with a motion for final judgment on behalf of certain other Claimants, this Court asked that, to expedite issuance of final judgments, claimants defer decision as to the appropriate quantum of punitive damages, *See* Order, Oct. 14, 2016, ECF No. 3362.  Accordingly, the *Gaston* Plaintiffs ask the Court allow them to submit future applications for punitive damages consistent with any future rulings of this Court.

### C.  Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (03-md-1570, ECF 2619 at 13-14). This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied. 03- md-1570, ECF No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all the claims. 03-md-1570, ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the Plaintiffs identified in Exhibit A to the attorney declaration respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## VII.    CONCLUSION

This Court has previously found that for more than a decade before the September 11, 2001 attacks, Iran conspired with al Qaeda and other terrorist organizations to wage a jihad

against the West. By providing material support and resources to al Qaeda, Iran facilitated the September 11, 2001 attacks on the United States, and caused catastrophic loss of life.

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for entry of judgment by default as to liability against Iran, as to their claims under §1605A(c) of the FSIA.

Further, Plaintiffs respectfully request that this Court award personal injury damages in accordance with the Court's classification of personal injury categories and consistent with its prior decisions for personal injury and latent injury plaintiffs; prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and grant permission for Plaintiffs to seek punitive damages, economic damages, or other appropriate damages at a later date; and grant permission for all *Gaston* plaintiffs not appearing on Exhibit A to the attorney declaration to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated: July 31, 2025

Respectfully submitted,

*/s/  Robert Keith Morgan*
Robert Keith Morgan
David J. Dickens
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960
Tel: 540-672-4224
Fax: 540-672-3055
Email: kmorgan@millerfirmllc.com

Counsel for Plaintiffs